# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**ROSALIA AND GERARDO CASTILLO,**
**Individually, and as Husband and Wife,**

      Plaintiffs,

vs.                                                  No. 1:12-cv-00810-JAP/KBM

**UNITED STATES OF AMERICA;**
**TRACE, INC., A Foreign Corporation;**
**OVERSEAS SERVICE CORPORATION,**
**A Foreign Corporation; TOP GUN SERVICES,**
**A Foreign Corporation; ACOSTA SALES AND**
**MARKETING, A Foreign Corporation;**
**ANTONIO GONZALES; FELICIA MEDINA;**
**JANE & JOHN DOES 1-10, and BLACK &**
**WHITE CORPORATIONS 1-10,**

      Defendants.

## MEMORANDUM OPINION AND ORDER

On October 14, 2013, Defendant, Top Gun Services (Top Gun), asked the Court to enter summary judgment in its favor. *See* DEFENDANT TOP GUN SERVICES' MOTION FOR SUMMARY JUDGMENT (Doc. No. 104) (Motion for Summary Judgment). Top Gun argues that it is not liable for the alleged negligence of Defendant Antonio Gonzalez (Mr. Gonzalez), the agent of Defendant Felicia Medina (Ms. Medina), because Ms. Medina was an independent contractor not an employee of Top Gun. Plaintiffs oppose the Motion. *See* PLAINTIFFS' RESPONSE TO DEFENDANT TOP GUN'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 117) (Response). In their Response, Plaintiffs request additional time to engage in discovery concerning the employment status of Ms. Medina. In the alternative, Plaintiffs ask the Court to find that there are material factual disputes concerning whether Ms. Medina was an employee of Top Gun. After reviewing the briefing, the Court concludes that there is sufficient evidence in

1

the record to create a genuine issue of material fact as to whether Ms. Medina was an employee. For that reason, the Court will deny Top Gun's Motion for Summary Judgment.[1]

## BACKGROUND

### A. The March 4, 2011 Accident

On March 4, 2011, Plaintiff Rosalia Castillo, then age 83, was shopping with her husband at the Commissary on the Kirtland Air Force Base (the Kirtland Commissary) in Albuquerque, New Mexico when she was struck by a flat-bed dolly, which was loaded with store products and was being pushed by Defendant Antonio Gonzalez. *See* SECOND AMENDED COMPLAINT FOR NEGLIGENCE AND PREMISES LIABILITY RESULTING IN PERSONAL INJURIES (Doc. No. 40) ¶¶ 18-19; Deposition of Antonio Gonzalez, marked as Exhibit 5 (Doc. No. 118) at 15:2-6; Deposition of Felicia Medina at 40:15-24.[2] Plaintiffs allege that Top Gun is vicariously liable for the injuries Ms. Castillo sustained as a result of the accident.

### B. Stocking Operations at the Kirtland Commissary

At the time of the accident, Mr. Gonzalez was stocking shelves for his friend, Defendant Felicia Medina, who was out sick. Medina Deposition at 11:23-12:3, 40:25-41:5. Ms. Medina had contracts with both Defendant Top Gun and Defendant Prime Team Services (Prime Team)[3]

---

[1] While it is not entirely clear, Top Gun's Motion for Summary Judgment only appears to address Plaintiffs' vicarious liability claim. Plaintiffs also assert a direct liability claim against Top Gun on the basis that Top Gun negligently hired Ms. Medina. In the Response, Plaintiffs argue that Top Gun's Motion for Summary Judgment does not dispose of the negligent hiring claim, and Top Gun does not dispute this characterization of its Motion for Summary Judgment in the reply. *See* DEFENDANT TOP GUN SERVICES' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 125). Because Top gun never mentions the negligent hiring claim, the Court will treat Top Gun's Motion for Summary Judgment as a motion for partial summary judgment solely on the vicarious liability claim.

[2] Both Plaintiffs and Defendant filed portions of Ms. Medina's deposition. *See* Exhibit 2 to Motion for Summary Judgment (Doc. No. 104-2); APPENDIX/SUPPLMENT (Doc. No. 118); Exhibits 1-12 to DEFENDANT TOP GUN SERVICES' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 125-1-125-12). For ease of reference, the Court will cite to her deposition simply as Medina Deposition.

[3] Prime Team has not moved for summary judgment at this time.

to stock shelves at the Kirtland Commissary.[4] *Id.* at 23:4-9. As Ms. Medina explained, Mr. Gonzalez was able to work for her because her contracts were "very open." *Id.* at 12:8. "If somebody is sick, someone can easily come and do your stuff for you. As long as the stuff is done, the store is happy." *Id.* at 12:8-10.

Defendant Top Gun had a contract with Defendant Overseas Service Corporation (OSC), a company that the United States hired to supply and stock merchandise at commissaries across the country, *See* Affidavit of Robert J. Martinez, marked as Exhibit 12 (Doc. No. 119) ¶¶ 9-10.[5] According to the OSC-Top Gun Contract, Top Gun agreed to provide "all logistical services for the shelf stocking of products as may be requested by OSC." Agreement, marked as Exhibit 7 (Doc. No. 118) ¶ 4(i). Top Gun accepted sole responsibility "for providing personnel required to perform the services to be provided by Top Gun." *Id.* ¶ 4(vi). During March 2011, Top Gun employed five "independent contractors" at the Kirtland Commissary in addition to Ms. Medina. Defendant Top Gun Services, Inc's Answers to Plaintiff's First Set of Interrogatories, marked as Exhibit 1 (Doc. No. 118) at 1-2.

## C. Ms. Medina and the Kirtland Commissary

Ms. Medina started stocking at the Kirtland Commissary when she was 16 or 17-years-old. *Id.* at 27:18-21. Initially, Ms. Medina stocked shelves on behalf of her sister, who had a "vendor account"[6] at the Kirtland Commissary. *Id.* at 25:12-16, 27:25-28:1-2. On June 1, 2010, at the age of 17, Ms. Medina began stocking shelves directly for Top Gun after signing an "Independent Contractor Agreement." *Id.* at 7:6-7, 26:16-19.

---

[4] Each Company stocked different products at the Kirtland Commissary. *Id.* at 16:1-2.
[5] Robert Martinez, Plaintiffs' expert, refers to OSC as OSC Solutions Incorporated. *Id.*
[6] It seems that Ms. Medina's sister had a contract, with a company like Top Gun, to stock shelves at the Kirtland Commissary. Ms. Medina did not recall the name of the company for which her sister worked. *Id.* at 28:3-6.

The "Independent Contractor Agreement" permitted Ms. Medina to hire her own employees or agents to stock shelves in her place. Independent Contractor Agreement, Exhibit 3 to Motion for Summary Judgment (Doc. No. 104-3) ¶ 1. It provided that she should "determine at [her] sole discretion the manner in which the [shelf stocking] serves are performed and the number of persons required to perform the services." *Id.* ¶ 4. Ms. Medina agreed to "be responsible for all training" and "provide all [necessary] tools and equipment." *Id.* ¶¶ 1, 4. In return, Top Gun agreed to pay Ms. Medina "on or before the tenth day after the receipt of [her] invoice for stocking services."[7] *Id.* ¶ 3.

According to Ms. Medina, she was told to sign the "Independent Contractor Agreement" outside an office where she normally got her badge. Medina Deposition at 92:10-12. Although she read the contract, she testified that she "couldn't really understand a few things." *Id.* at 92:6-8. For example, at her deposition, Ms. Medina testified that she did not know what an independent contractor was. *Id.* at 62:9-12. When asked if she invoiced Top Gun, Ms. Medina responded "I don't understand," and had to be told what an invoice was before she answered. *Id.* at 93:13-18. At an earlier point, she was asked "Do you understand that under paragraph five, that you have agreed to indemnify Top Gun from any losses that they incur because of your work? By that, indemnify in that connection means you have to pay them if they have to pay any money." *Id.* at 61:14-18. She responded "Right. I had to pay taxes at the end of the year." *Id.* at 61:19-20.

During the period in which Ms. Medina stocked shelves for Top Gun, she typically worked at the Kirtland Commissary seven days a week. *Id.* at 21:21-24. She did not work anywhere else; stocking shelves at the Kirtland Commissary was her only job. *Id.* at 28:19-24.

---

[7] Ms. Medina testified that she understood that Top Gun would not take taxes out of her paycheck; she would need to pay her own taxes. Medina Deposition at 102:12-15.

To complete her work, she borrowed a date gun from a meat room employee, *Id.* at 56:14-16, and used a flat-bed dolly supplied by the Kirtland Commissary, *Id.* at 71:19-20.

According to Ms. Medina, a representative of Top Gun who she called "Ms. B" or "Ms. Beatrice" was one of her bosses. *Id.* at 19:5-10. Ms. Beatrice worked at the Kirtland Commissary and communicated with Ms. Medina nearly every day. *Id.* at 24:10-21. Ms. Beatrice provided Ms. Medina with a list of Top Gun products to stock and would orally inform Ms. Medina of product changes. *Id.* at 20:8-20. In her deposition, Ms. Medina provided various descriptions of her relationship with Ms. Beatrice. Ms. Medina testified that Ms. Beatrice instructed her to "keep the shelves full, no NISs, which means no not in shelf, which is like empty shelves. And that's about it." *Id.* at 104:12-17. However, Ms. Medina also stated that Ms. Beatrice occasionally called her to tell her what to do. *Id.* at 25:1-7.

In addition, it appears that Ms. Beatrice invoiced Top Gun on behalf of Ms. Medina. Ms. Medina testified that she never invoiced Top Gun and never provided Top Gun with any documentation concerning the products she stocked. *Id.*at 93:13-14, 54:20-55:2. She stated that Top Gun "would see in the store" that she had completed her work and would then pay her by the case. *Id.* at 13:19-20 55:1-5.

While Ms. Medina generally decided when to come to work, how to complete the work, and in what order to stock the shelves, *Id*. at 100:12-17, 101:7-13, 104:21-23, 116:24-25, there were exceptions. Ms. Medina testified that she "would have to come in right then and there" if the store got upset. *Id.* at 21:16-17, 116:10-13. Additionally, on a few occasions, Kirtland Commissary employees told Ms. Medina to restock a product that was running low. *Id.* at 63:12-17.

## DISCUSSION

### A.  Summary Judgment Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, then, the Court's "role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim."*Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

### B.  New Mexico Law Regarding Independent Contractor Versus Employee Status

Top Gun claims that it is not vicariously liable for the negligence of Mr. Gonzalez, because Ms. Medina was an independent contractor of Top Gun. "As a general rule, an employer of an independent contractor is not responsible for the negligence of the contractor or his employees." *Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 393-394 (1992).

Plaintiffs contend that Ms. Medina was an employee of Top Gun. The most common test for distinguishing between an independent contractor and an employee is whether the employer

had the right to control the manner in which the work was performed. *Id.*; *Wilson v. Brennan*, 666 F. Supp. 2d 1242, 1263 (D.N.M. 2009) ("In many cases . . .  the principal test to determine whether a person is an employee is whether the employer had the right to control the details or the methods of the work to be accomplished."). However, the New Mexico Supreme Court has recognized that the right to control criterion considered in isolation is not the most appropriate test for identifying an independent contractor. *See Celaya v. Hall*, 135 N.M. 115, 119 (2004) ("Our case law indicates that the right to control analysis is more complex, and demands a more nuanced approach, than simply determining the degree of control over the details or methods of the work.").

In *Celaya*, the New Mexico Supreme Court adopted the Restatement (Second) of Agency § 220, which incorporates eight factors into the right to control analysis. These factors are: "1) the type of occupation and whether it is usually performed without supervision; 2) the skill required for the occupation; 3) whether the employer supplies the instrumentalities or tools for the person doing the work; 4) the length of time the person is employed; 5) the method of payment, whether by time or job; 6) whether the work is part of the regular business of the employer; 7) whether the parties intended to create an employment relationship; and 8) whether the principal is engaged in business." *Id.*

Top Gun argues that New Mexico law reserves the Restatement's totality of the circumstances approach "for professionals" and asks the Court to apply a more simplistic "right to control test" in this case. Reply at 6. A thorough review of New Mexico case law refutes the claim that there are two distinguishable tests for identifying an independent contractor. Even before *Celaya*, New Mexico courts indicated that the right to control criterion was not exclusive; "there is no single nor sure criterion" for identifying an independent contractor. *Harger v.*

*Structural Servs.*, 121 N.M. 657, 667 (1996); *see also Eastland Fin. Servs. v. Mendoza*, 132 N.M. 24, 29 (N.M. Ct. App. 2002) ("We consider all relevant circumstances when determining whether an employer/employee relationship exists."). "A fact found controlling in one combination may have a minor importance in another." *Harger*, 121 N.M. at 667.

Since *Celaya*, the New Mexico Court of Appeals has rejected the argument that *Celaya* created a special, more nuanced test, for professionals. *See Martinez v. St. Vincent Hosp.*, 2011 WL 2041841, at *2 (N.M. Ct. App. Apr. 27, 2011) ("*Celaya* simply indicates that the degree and nature of control over an employee will vary depending on the type of work being performed and that a whole range of factors must be examined, not just whether the employer has the right to control the particular details of the work itself."). Under New Mexico law, the Court must consider the totality of the circumstances, guided by the specific factors listed in the Restatement (Second) of Agency § 220.

## C. There is a Genuine Issue of Material Fact About Whether Ms. Medina was an Employee or Independent Contractor

The Restatement factors suggest that Ms. Medina could have been an employee of Top Gun. Most significantly, certain facts indicate Top Gun exercised some control over the details of Ms. Medina's work. Ms. Medina spoke with Ms. Beatrice, a Top Gun representative who she considered to be her boss, nearly every day. Ms. Beatrice worked at the Kirtland Commissary with Ms. Medina and would call Ms. Medina on the phone and tell her what to do. These facts tend to show that Ms. Medina was an employee.

On the other hand, Top Gun correctly notes that Ms. Medina, not Top Gun, exercised control over certain details of the job; Ms. Medina could hire employees to stock shelves in her place and Ms. Medina generally decided when to come to work and how long to work. These factors imply that Ms. Medina was an independent contractor, although they are not dispositive.

8

"[T]he determination of independent contractor status versus an employer-employee relationship is based on whether there is 'the right to control,' and not on whether the right to control was exercised." *Yazzie v. Law Offices of Farrell & Seldin*, 2011 WL 10949126, at *3 (D.N.M. June 15, 2011). While Ms. Medina was generally permitted to set her own hours, Top Gun appears to have retained the right to call Ms. Medina and tell her to come to work. Furthermore, Ms. Medina indicated that in practice Ms. Beatrice may have retained some influence over who Ms. Medina hired to stock shelves; when asked whether it was her decision to hire Mr. Gonzalez, Ms. Medina stated "Yes. But Ms. B knew Antonio, so it was totally fine." Medina Deposition at 102:4-7.

Next, in analyzing the right to control, the Court considers the eight factors set forth in the Restatement (Second) of Agency § 220. Here, five of the eight factors appear to confirm that Ms. Medina was a Top Gun employee. Consider the first two factors: the type of occupation and the skill required. Not only is stocking shelves customarily performed by store employees, stocking shelves does not require an advanced skill set. "Unskilled labor is usually performed by those . . . regarded as servants, and a laborer is almost always a servant in spite of the fact that he may nominally contract to do a specified job for a specified price." Restatement (Second) of Agency § 220 cmt. i. The length of Ms. Medina's employment, the fourth factor, bolsters a conclusion that Ms. Medina was an employee. Ms. Medina worked at the Kirtland Commissary seven days a week for at least a year. It was her only job.

The sixth and eighth factors, which focus on the business operations of the principal, encourage an inference that Top Gun acted as Ms. Medina's employer. Top Gun is a business, not an individual. Furthermore, stocking shelves appears to be part of Top Gun's regular business; it specifically contracted with OSC to provide shelf stocking personnel at United States

commissaries.[8] At the time of the accident, Top Gun employed five "independent contractors" at the Kirtland Commissary, not counting Ms. Medina.

The remaining three factors do not unequivocally show that Ms. Medina was either an employee or an independent contractor. The third factor, the provision of tools, and the fifth factor, the method of payment, could support either conclusion. Ms. Medina's contract required her to "provide all tools and equipment." However, she never purchased any tools to stock shelves. She borrowed a date gun from a meat room employee, and the Commissary provided the flat-bed dolly she used to stock shelves. Top Gun paid Ms. Medina by the case, as if she were an independent contractor, but Ms. Medina's failure to invoice Top Gun undermines, somewhat, Top Gun's claim that she was paid as an independent contractor.

Finally, the intention of the parties, the seventh factor, cuts both ways. By labeling Ms. Medina an independent contractor, Top Gun signaled that it did not intend to create an employment relationship. It reaffirmed this intention throughout its relationship with Ms. Medina when it refrained from withholding taxes from her paycheck.  In contrast, Ms. Medina clearly did not intend to become an independent contractor, because she did not even know what it means to be an independent contractor.

The Court cannot say, as a matter of law, that Ms. Medina was an independent contractor merely because Top Gun, the party that drafted the contract, intended to avoid an employment relationship. "How an employment contract defines the status of an individual, while relevant and material, does not answer whether an individual is . . . an independent contractor." *Blea v.*

---

[8] Top Gun disputes that stocking shelves is part of its regular business. Motion at 7. It claims to be a "data processing" company that identifies what needs to be stocked and contracts with others to do the stocking. *Id.*  In essence, Top Gun claims that stocking is not part of its regular business because it labels the personnel it hires to stock shelves "independent contractors." This is a circular argument. It is undisputed that Top Gun agreed to provide personnel, either employees or independent contractors, to stock shelves at United States commissaries.

*Fields*, 138 N.M. 348, 354 (2005). In this case, there are strong reasons for discounting the effect of the contract. Ms. Medina entered into the "Independent Contractor Agreement" as a minor; hence, it is not clear that the contract is enforceable.

After reviewing the conflicting evidence under the relevant factors, the Court concludes that there is a factual issue as to whether Ms. Medina was an employee or an independent contractor.

IT IS THEREFORE ORDERED THAT DEFENDANT TOP GUN SERVICES' MOTION FOR SUMMARY JUDGMENT (Doc. No. 104) is denied.


_____

SENIOR UNITED STATES DISTRICT JUDGE